# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1056V

| | |
|---|---|
| BARBARA J. GIDDENS, | Chief Special Master Corcoran |
| Petitioner, | Filed: November 14, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Kelly Elizabeth Elder*, Martin & Jones, PLLC, Raleigh, NC, for Petitioner.

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

On August 21, 2020, Barbara J. Giddens filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on December 18, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that record evidence preponderantly establishes that the onset of Petitioner's shoulder pain began within 48 hours of vaccination, and that Petitioner has satisfied the remaining requirements for entitlement.

## I.     Relevant Procedural History

A year after the case was activated, but before Respondent had completed his medical review of the claim, Petitioner filed a motion to appoint a damages expert. She maintained that her injury had forced her to retire early, resulting in a substantial reduction in her retirement annuity (ECF No. 30). She therefore wished to retain an economist to calculate the claimed reduction, although Respondent argued that the motion was premature (ECF No. 32). While that motion was pending, Respondent completed his medical review and stated that he wished to engage in settlement negotiations (ECF No. 34). I subsequently denied the motion but directed the parties to negotiate, adding that I would invite a motion for ruling on the record if discussions failed (ECF No. 37).

Because those discussions did not succeed, Petitioner filed a motion for a ruling on the record on October 11, 2022 (ECF No. 47). Respondent filed his Rule 4(c) Report and a response to the motion on December 2, 2022 (ECF No. 48)[3], and Petitioner replied on January 4, 2023 (ECF No. 53). The issues of the onset of Petitioner's shoulder pain and her entitlement to compensation are now ripe for resolution.

## II.    Factual Findings and Ruling on Entitlement
### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special

---

[3] On December 2, 2022, Respondent made two filings in CM/ECF, one as "Respondent's Report" (ECF No. 48) and the other as "Response to Motion for Ruling on the Record" (ECF No. 49). The documents attached to both filings appear to be identical; for purposes of this ruling I refer to the first document, ECF No. 48.

master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Relevant Factual History

This ruling contains only a brief overview of facts relating to the onset of Petitioner's symptoms and her entitlement to compensation, with some additional background related to her claim for a reduced retirement annuity.

### 1. Medical Records

On December 18, 2017, Petitioner received a flu vaccine in her right arm. Ex. 2 at 13. Four days later, she saw her primary care physician, Dr. Sumedha Dalvi,[5] for hyperlipidemia, hypertensive cardiac disease, and hypothyroidism. Ex. 7 at 47. She reported left foot pain, but no other musculoskeletal concerns. *Id.* On examination, Dr. Dalvi noted that Petitioner had "full, painless range of motion of all major muscle groups and joints." *Id.* at 49. The record noted tenderness and effusion in Petitioner's left knee, but no other musculoskeletal problems. *Id.* The record does not contain any indication that Petitioner reported, or was experiencing, any problems with her right shoulder. *Id.* at 47-53.

A month later (January 22, 2018), Petitioner returned to Dr. Dalvi - now complaining of right shoulder pain. Ex. 7 at 54. The record of this visit is typed, but also contains several handwritten alterations that appear to have been made over a year later.[6] *Id.* The typed portion of the January 22nd record states that Petitioner complained of right shoulder pain that initially started three months earlier – which would put onset about *two months before* vaccination – with no obvious precipitating injury. Ex. 7 at 54. The handwritten changes delete the words stating that the pain started "3 months ago," delete the sentence stating there was no precipitating injury, add the words "30 days" after her complaint of right shoulder pain, and add "Pt. reports pain started 12/2017 after receiving flu vaccine at Fort Bragg. See details in the letter attached."[7] *Id.* Thus, the original, typed record suggests that the onset of Petitioner's pain occurred two months before vaccination, while the altered record suggests that her pain began in December, possibly five days *after* vaccination.

On examination, Petitioner displayed decreased range of motion ("ROM") with right shoulder extension, and pain with right shoulder extension and external rotation. Ex. 7 at 56. Dr. Dalvi assessed her with right shoulder pain and ordered x-rays, an ultrasound, and a topical non-steroidal anti-inflammatory drug ("NSAID"). *Id.* at 57. She advised Petitioner to apply heat and start physical therapy ("PT"), and referred her to an orthopedist. *Id.*

---

[5] The record includes records from two physicians named Dr. Dalvi: Dr. Sumedha Dalvi, and Dr. Sanjiv Dalvi, both with Cumberland Medical Associates. Exs. 7, 14. Petitioner saw Dr. Sanjiv Dalvi on December 15, 2020; all other appointments with a Dr. Dalvi were with Dr. Sumedha Dalvi. Therefore, any references herein to "Dr. Dalvi" without specifying a first name refer to Dr. Sumedha Dalvi.

[6] In a May 13, 2019 letter accompanying the records, Dr. Dalvi explained that the notes of this visit "need some additions/editing, however since they have been electronically signed off, I am unable to make changes or edit." Ex. 7 at 1.

[7] The reference to the "letter attached" appears to refer to the May 13, 2019 letter found in Ex. 7 at 1-2.

Petitioner's medical records include a subsequent February 16, 2018 email to Mrs. Giddens from Laurie Duran, a nurse practitioner with the Defense Health Agency ("DHA") Immunization Healthcare Branch. Ex. 7 at 42-43. The email refers to Petitioner's December 2017 flu vaccine and states that as Ms. Duran mentioned on the phone, what Petitioner described sounded consistent with SIRVA. *Id.* at 42.

On February 20, 2018, Petitioner saw Dr. Bruce McClenathan with the DHA Immunization Healthcare Branch. Ex. 2 at 115. The record states the reason for the appointment was "SIRVA." *Id.* Petitioner stated that she developed right shoulder pain within 48 hours of receiving her flu vaccine in her right deltoid on December 18, 2017, and that the pain had been "significant and persistent." *Id.* She did not recall the exact injection situs, but did not recall it being high on her shoulder. *Id.* She developed significant soreness where the vaccine was injected, without observable swelling or redness, that progressed to stiffness and decreased ROM that had persisted for over two months. *Id.* Petitioner reported a pain level of seven out of ten, describing it as a dull pain with movement, especially with internal rotation. *Id.* The pain could be minimal to zero at rest. *Id.* She had tried topical Voltaren gel without significant improvement, and had not yet tried oral NSAIDs or PT. *Id.*

On examination, she had a "clear discrepancy" in internal rotation in her right shoulder compared to her left shoulder. Ex. 2 at 116. Petitioner was diagnosed with adverse effects of a vaccine, with a clinical history and exam "most consistent with SIRVA." *Id.* The differential diagnosis included impingement syndrome, rotator cuff tear, biceps tendonitis, osteoarthritis, and less likely adhesive capsulitis. *Id.* Because her pain began within 48 hours of vaccination, Dr. McClenathan suspected SIRVA as the most likely cause, and ordered an MRI. *Id.* He prescribed Naproxen and PT. *Id.*

Two days later (February 22, 2018), Petitioner underwent a right shoulder MRI. Ex. 2 at 112. The reason for the MRI was noted as "shoulder pain [beginning] 2 days after flu vaccine and now persisting for more than 60 days." *Id.* The MRI showed a possibly degenerative superior labral tear, moderate joint effusion and mild subacromial subdeltoid bursitis, and mild acromioclavicular joint arthrosis. *Id.* at 113.

On March 23, 2018, Petitioner obtained a PT evaluation for her right shoulder. Ex. 2 at 108. She reported that "~90 days ago" she had a flu shot in her right shoulder, and "immediately 2-24 hours after this happened she began to experience pain and edema and inability to put her R[ight] UE [upper extremity, or arm] behind her back," which had persisted. *Id.* She reported a pain level of one out of ten at present and six out of ten at worst. *Id.* On examination, her right shoulder active ROM was five degrees in internal

6

rotation, 90 degrees in external rotation, and within normal limits in flexion and abduction.[8] *Id.* at 109. She had positive results on the empty can, Yergason, Jerk, and AC Compression tests. *Id.* at 110. The physical therapist noted increased edema to Petitioner's right shoulder compared to left. *Id.* (Petitioner continued PT through 2018 to January 3, 2019. *Id.* at 107-241.)

On the same day as her PT evaluation, Petitioner saw orthopedist Dr. John Snurkowski for right shoulder pain. Ex. 2 at 103. Petitioner reported that she received a flu vaccine in her right deltoid on December 18, 2017, and "two-three days later, started having increased right shoulder pain, and loss of motion of the shoulder." *Id.* Her shoulder felt swollen and she had noticed a loss of motion, stiffness, and pain with certain movements. *Id.* Dr. Snurkowski reviewed Petitioner's x-rays and MRI, and assessed her with "frozen shoulder with correlation to flu vaccine." *Id.* at 105. He offered her a steroid injection, but she declined. *Id.* He recommended that she continue PT to improve her ROM, continue Voltaren gel, and return in a month. *Id.*

Petitioner followed up with Dr. Snurkowski for her shoulder pain on April 19, 2018. Ex. 2 at 92. She had been going to PT, and felt her ROM was improving. *Id.* She was not taking pain medication. *Id.* Dr. Snurkowski advised her to continue with PT for her ROM, and consider manipulation under anesthesia if she hit a plateau and her ROM was interfering with activities of daily living. *Id.* He advised her that adhesive capsulitis could take up to a year to reach maximum improvement. *Id.*

Nearly four months later (August 14, 2018), Petitioner saw Dr. McClenathan to follow up on her SIRVA. Ex. 2 at 28. At this time, she was not having any pain in her right shoulder, but with internal rotation and adduction felt pain at a level of one out of ten. *Id.* Her pain and ROM had improved since starting PT, but she still had pain with certain movements, especially reaching behind her back. *Id.* Dr. McClenathan recommended that she continue PT and avoid future vaccinations in her right arm. *Id.* at 31.

At her January 3, 2019 PT session, Petitioner reported "a significant improvement in her ROM overall." Ex. 2 at 239. She continued to have lateral shoulder pain, especially during cold weather, and intermittent popping during movement. *Id.* The physical therapist noted "a very mild loss of hand behind the back motion," and believed that her adhesive capsulitis was "mostly resolved." *Id.* at 241. He noted that she might continue to have some chronic bursal inflammation, but stated that "this is not impacting her function." *Id.* He did not recommend continued PT because "she has received over 30 visits and demonstrates good functional abilities." *Id.* The therapist directed her to return to her

---

[8] Normal shoulder ROM for adults ranges from 90 to 100 degrees in external rotation and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 84, 88 (F. A. Davis Co., 5th ed. 2016).

7

orthopedist to discuss the need for a repeat MRI as the therapist did "not feel this is necessary." *Id.*

Less than two weeks later (January 16, 2019), Petitioner saw orthopedist Dr. Kenneth Nelson for right shoulder pain. Ex. 2 at 235. She had improved "fairly significantly compared to where she was originally" with PT, but "continues to have pain in her shoulder with motion, particularly anything over 90° of abduction." *Id.* She went to Dr. Nelson "predominantly to obtain a referral back to physical therapy." *Id.* at 236. Dr. Nelson provided a PT referral and stated that he thought it was "likely that she will continue to improve at this point." *Id.* He did not see any indication for a repeat MRI, as she was improving, but if she started getting worse, plateaued, or stopped improving, he said she should return for a surgical evaluation. *Id.*

Petitioner attended a second round of PT from February 7 to April 8, 2019. Ex. 4 at 1-36. At her February 7, 2019 evaluation, she reported that she had some pain into her right first and second fingers when putting her hands on her hips, and sleeping with her arm over her head was uncomfortable. *Id.* at 2. She had difficulty putting on and taking off her bra, but *her arm had not bothered her at work*. *Id.* (emphasis added). She was found to have signs and symptoms consistent with a diagnosis of frozen shoulder, with decreased ROM, decreased muscle length, strength deficits, and postural impairments. *Id.* at 3. Four days later, she reported that she felt "a little sore after the last session." *Id.* at 5. On February 21, 2019, her shoulder was "feeling pretty good today and she is in no pain at rest." *Id.* at 11. Four days later, she was "not in any pain at the moment" and the "tingling in her hand ha[d] improved." *Id.* at 13.

On March 7, 2019, Petitioner experienced "some discomfort in [the] top of her R[ight] shoulder and on her shoulder blade." Ex. 4 at 19. Twelve days later, she was "currently not in any pain." *Id.* at 25. On March 21, 2019, her shoulder was "feeling good" with "no pain at the moment." *Id.* at 27. On April 1, 2019, she reported that "her arm felt as though it was 'swelling' around the lateral R elbow region on Friday, but it subsided that evening" and she was "feeling pretty good today." *Id.* at 31. On April 8, 2019, she reported that her arm had "started to ache last night and has continued into the day today," a feeling she described as "uncomfortable." *Id.* at 33. She showed improved joint mobility and soft tissue extensibility, and was able to perform exercises without an increase in pain. *Id.* She asked for her PT to be put "on hold" for 30 days. *Id.*

On September 3, 2019, Petitioner saw Dr. McClenathan for her shoulder pain. Ex. 2 at 606. She had completed a second round of PT in April 2019, and noted "up to 70% overall improvement but still has residual pain and decreased ROM (int rotation and abduction) currently." *Id.* She awoke with pain approximately three times a week. *Id.* She was able to complete all activities of daily living, with modifications. *Id.* Dr. McClenathan recommended that Petitioner continue her home exercises and follow up as needed. *Id.* at 608.

8

Petitioner saw Dr. Dalvi on October 7, 2019, November 18, 2019, and February 18, 2020. Ex. 14 at 2-29. The November 18 record notes shoulder pain of moderate intensity happening for five to ten minutes at a time, several times a month. *Id.* at 11. Dr. Dalvi advised her to keep a log of these events. *Id.* at 16. At the February 18, 2020 appointment, Petitioner reported stiffness in her shoulder and hands. *Id.* at 19. She reported right shoulder pain of moderate intensity on a daily basis. *Id.* at 20. Dr. Dalvi prescribed an NSAID and recommended heat therapy and an orthopedic consult. *Id.* at 27. Petitioner continued to see Dr. Dalvi throughout 2020 for various concerns, with no mention of right shoulder pain. *Id.* at 30-61.

On December 15, 2020, Petitioner saw Dr. Sanjiv Dalvi for several health concerns and a Medicare Annual Wellness Physical. Ex. 14 at 62. Petitioner complained of right shoulder pain that "initially started 3 years ago." *Id.* at 63. The record states that the apparent precipitating event was "lifting," but the mechanism of injury was unknown. *Id.* It was moderate in severity, with shoulder stiffness, crepitus, and weakness. *Id.* The pain was relieved with rest and heat, and increased with flexion, abduction, external rotation, lifting, and daily activities requiring overhead activity. *Id.* On examination, Petitioner had decreased ROM and pain with right shoulder extension, abduction, internal rotation, and external rotation. *Id.* at 65. Petitioner was advised to use Tylenol and heat therapy, and was referred to an orthopedist. *Id.* at 71.

Petitioner saw Dr. Sumedha Dalvi again on January 8, 2021 for several concerns including shoulder pain. Ex. 14 at 74. The description of the pain and treatment recommendations are nearly identical to the December 15, 2020 record. *Id.* at 75, 82-83. Petitioner attended additional PT from March to June of 2021. Exs. 13, 19.

### 2. Affidavits

Petitioner has submitted two affidavits in support of her case. Exs. 6, 17. She states that she began experiencing pain, swelling, and stiffness in her right shoulder and arm within 48 hours of vaccination. Ex. 17 at ¶ 4. She explained that she did not complain about the pain at her PCP visit four days after vaccination because she "did not realize that [she] was experiencing anything more than normal, temporary, post-vaccination soreness." *Id.* Her pain and stiffness intensified and grew progressively worse over the next 30 days, impacting her ability to do things requiring moving her right arm and first and second fingers on her right hand. *Id.* at ¶ 5. The pain was worse at night and affected her sleep. *Id.*

Petitioner states that when she completed her first round of PT in January 2019, she was told that her level of functioning would not improve further. Ex. 17 at ¶ 11. Until this time, she had remained positive about her ability to rehabilitate her arm, but then began to accept that limitations would be her new "normal." *Id*. Her job required that she type and produce time-sensitive documents and presentations. *Id*. Due to her injury, she now went to work one or two hours earlier than normal in order to complete her assigned tasks, and required frequent breaks. *Id*.

At the conclusion of her second round of PT in April 2019, she continued to experience weakness and intermittent tenderness in her right shoulder and cervical region. Ex. 17 at ¶ 13. She did not request additional PT authorization "because it was thought I had improved enough to perform activities of daily living, but typing, my primary work duty, remained painful as it inflamed my injury." *Id*.

Petitioner also states that her plan had been to retire in December 2020 with 25 years of creditable service. Ex. 17 at ¶ 20. Instead, on February 28, 2019, she informed her supervisor that she would be retiring on May 31, 2019 for health reasons. *Id*. Petitioner "felt that [she] could no longer perform at the adjusted pace for my daily tasks, which required coming in early to complete my tasks in a timely manner, due to the level of pain in [her] dominant arm." *Id*. Her quality of life diminished due to excessive hours and pain at work. *Id*. At her retirement on May 31, 2019, she had 23 years and 11 months of service. *Id*. She states that she "would not have retired earlier than 25 years of service had this vaccine injury not occurred." *Id*. She explains that she also used sick leave to treat her SIRVA, and that had she not done so, unused sick leave would have been used to increase the length of service, resulting in a higher monthly retirement annuity. *Id*. at ¶ 21.

### 3.  Unsworn Memorandum of Petitioner's Former Supervisor

Petitioner has offered into evidence a document dated October 5, 2021, and titled "Memorandum for Record," with a subject line of "Letter of Input for Mrs. Barbara Giddens, Family Programs Liaison Officer (Retired)." Ex. 18. The letter is signed by Mufutau A. Taiwo, Deputy Director of Family Programs at the United States Army Reserve Command Headquarters in Fort Bragg, North Carolina, and is on Army letterhead, but is not notarized or signed under penalty of perjury. *Id*.

Mr. Taiwo states that Petitioner provided "superior and superb" service during her time in his office. Ex. 18 at ¶ 1. She "put her health issues aside to ensure the mission was accomplished." *Id*. at ¶ 3. In February or March of 2019, Petitioner notified Mr. Taiwo of her deteriorating health condition. *Id*. She was "a consummate professional, [and] continued to execute her duties with precision and excellence" in spite of a "worsening quality of life." *Id*. Mr. Taiwo adds that his office "lost a shining star when Mrs. Giddens

10

informed me of her decision to retire to take care of herself and spend time with her Family." *Id.*

### C. The Parties' Arguments

Petitioner argues that she has shown by a preponderance of the evidence that the SIRVA elements, plus general Act requirements, are met, entitling her to compensation. Petitioner's Motion for Ruling on the Record, filed Oct. 11, 2022 (ECF No. 47) ("Pet."). On the disputed question of onset, Petitioner acknowledges concerns about the lack of reference to SIRVA onset in the December 22, 2017 and January 22, 2018 records, but asserts that "[s]ince [the time of the January 22] visit, Mrs. Giddens and her records have been consistent that this injury was caused by her vaccine injury, and that the right shoulder pain appeared within 48 hours." Pet. at *9. Concerning the absence of any mention of shoulder pain in the December 22nd record, she cites her affidavit, in which she explained that she did not complain of arm and shoulder pain at this time, four days after vaccination, because she "did not realize [she] was experiencing anything more than normal, temporary, post-vaccination soreness." Pet. at *8-9 (citing Ex. 17 at ¶ 4).

With respect to handwritten alterations to the January 22, 2018 Dr. Dalvi record, Petitioner cites *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) for the proposition that "[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent"). Pet. at *9. Petitioner argues that the Womack Army Medical Center records – which includes the records of Dr. McClenathan, Dr. Snurkowski, Dr. Nelson, and her first round of PT – make clear that her injury occurred within 48 hours of vaccination, and her Cumberland Medical Associates records – Dr. Dalvi's records – should be relied on only to show that she presented to her physician. *Id.* at *9 n.1.

Petitioner also requests a specific element of compensation, based on an alleged reduction in her retirement annuity, in the amount of the difference between her current annuity and what she would have received had she retired on December 31, 2020, as originally planned (with 25 years of creditable service). Pet. at *12-13, 14, 17. Because of her vaccine injury she "felt that [she] could no longer perform at the adjusted pace for my daily tasks, which required coming in early to complete [her] tasks in a timely manner, due to the level of pain in [her] dominant arm." *Id.* As a result, she retired early – on May 31, 2019. *Id.* Although her PT records state that her shoulder had not bothered her at work and could suggest that she was pain-free, Petitioner asserts that her testimony, together with a letter from her former supervisor (Exhibit 18), are sufficient to overcome the presumption of accuracy of the PT records. *Id.* at *15. She adds that there were no

11

adequate accommodations available and, even if there were, they would have required her to learn new technology for one and a half additional years of work. *Id.*

Respondent argues that Petitioner is not entitled to compensation, and the petition should be dismissed. Respondent's Rule 4(c) Report and Response to Petitioner's Motion, filed Dec. 2, 2022 (ECF No. 48) ("Resp."). First, Respondent asserts that Petitioner has not preponderantly demonstrated that the onset of her shoulder pain occurred within 48 hours of vaccine administration. *Id.* at *17. Petitioner did not report right shoulder pain until over a month after vaccination. *Id.* at *19. In the interim, she saw Dr. Dalvi but made no mention of pain at that time. *Id.* Furthermore, Petitioner's contemporaneous medical records "differ regarding the onset date of her shoulder symptoms." *Id.* at *20. The record of her January 22, 2018 appointment initially stated that her right shoulder pain began three months prior (meaning two months *before* vaccination). It later was changed to suggest that the pain had been present for 30 days, but this would place onset *five days* after vaccination. *Id.* Either version of this record, therefore, would place onset outside of the time set forth in the Table. *Id.* Respondent urges that I place more weight on the initial, unaltered record, suggesting that likely Dr. Dalvi based her alterations to the record on facts relayed to her by Petitioner. *Id.* (*citing Clavio v. Sec'y of Health & Human Servs.*, No. 17-1179V, 2020 WL 1672956, at *9 (Fed. Cl. Spec. Mstr. Mar. 11, 2020)).

Respondent adds that at later appointments, Petitioner inconsistently placed onset within 48 hours of vaccination (February 20, 2018 appointment with Dr. McClenathan); within 2-24 hours of vaccination (March 23, 2018 PT evaluation); two to three days after vaccination (March 23, 2018 appointment with Dr. Snurkowski); "the very next day" after vaccination (February 17, 2019 PT intake); and "several months ago" (November 18, 2019 Dr. Dalvi appointment). Resp. at *20. In light of these inconsistencies, Respondent argues that any later affidavits asserting that onset occurred within 48 hours "conflict with the contemporaneous records, which do not resolve petitioner's date of onset, and are thus deserving of little weight." *Id.* at *21. Respondent argues that pursuant to *Kirby*, 997 F.3d at 1528, I should give greater weight to contemporaneous medical records than to later, contradictory testimony. Resp. at *18.

Second, Respondent argues that Petitioner has not shown that she is entitled to anticipated lost earnings. Resp. at *22-23. Respondent notes that three months before retirement, Petitioner reported that her shoulder "[had not] bothered her at work." *Id.* (*citing* Ex. 4 at 2). The letter of Petitioner's former supervisor stated that Petitioner told him in February or March of 2019 that her right shoulder pain was the result of execution of her duties, not her vaccine injury. *Id.* at *23 (*citing* Ex. 18 at 2). And on May 3, 2019, less than a month before her retirement, Petitioner was discharged from PT because she was "no longer having pain." *Id.* (*citing* Ex. 4 at 35). Respondent adds that Petitioner had numerous other health conditions, which may – and likely were – factors in Petitioner's

decision to retire earlier than intended. *Id.* Respondent requests the opportunity to more fully address damages in subsequent briefing, if I find that Petitioner is entitled to compensation. *Id.* at *23 n.33.

Petitioner replies that Respondent "misstates the facts and asserts unfounded inaccuracies." [9] Petitioner's Reply to Respondent's Response, filed Jan. 4, 2023 (ECF No. 53) ("Reply"). Petitioner argues that the distinctions Respondent makes as to the onset stated in her medical records are "distinctions without differences." Reply at *3-4. Petitioner views these records as supporting her claim that her shoulder pain began within 48 hours of vaccination. *Id.* Petitioner adds that Respondent misconstrues the letter of her former supervisor, stating that this letter does not state that the supervisor was informed in February or March of 2019 of her *injury* itself – but rather of her deteriorating health issue. *Id.* at *6-7 (*citing* Ex. 18 at 1).

### D. Factual Finding Regarding QAI Criteria for Table SIRVA

#### 1. Onset

After a review of the entire record, I find, based on a preponderance of the evidence, that more likely than not the onset of Petitioner's shoulder pain began within 48 hours of vaccine administration. While the first two records after Petitioner's vaccination could suggest that the onset of her shoulder pain did *not* occur in the Table timeframe, nearly all later records support her onset contentions.

Admittedly, Petitioner saw her PCP four days after vaccination but made no mention of shoulder pain.[10] Ex. 7 at 47. And although the first time she sought care for her right shoulder pain was just over a month after vaccination, the pre-altered version of that record reported the pain had started three months earlier, which would put onset *two months before* vaccination. Ex. 7 at 54. The record was later altered to suggest that the

---

[9] Petitioner argues that Respondent "misunderstands and misstates" her place of employment, and on that basis "appears to attempt to undermine the opinions of the treating physicians at Womack." Reply at *2. I find no reason to question the credibility of the Womack records, and give them the same weight I accord the remaining medical records. As to Petitioner's objection to Respondent's assertion that Petitioner must articulate a specific shoulder injury such as bursitis, adhesive capsulitis (Reply at *5), my reading of Respondent's argument is that Respondent believes such a specific injury would be required for an *off-Table* claim, not for a Table SIRVA claim. Finally, the question whether Petitioner has Arnold-Chiari syndrome (Reply at *5-6), or any other additional health conditions identified by Respondent, has no bearing on my ruling herein.

[10] This record also states that she had "full, *painless* range of motion of all major muscle groups and joints." Ex. 7 at 49 (emphasis added). However, this is a record of a single point in time, and does not definitively establish that Petitioner did not experience shoulder pain within 48 hours of vaccination. It could reasonably be construed to mean only that there was no pain upon movement of the shoulder at this time – distinguishable from a general lack of pain.

13

onset was 30 days earlier, which could imply it started *five days after* vaccination – beyond the 48 hour timeframe for a Table SIRVA claim. *Id*.

Thereafter, however, Petitioner's medical records almost exclusively placed the onset of her shoulder pain within 48 hours after vaccination, and related her pain to the vaccination as well. When Petitioner saw Dr. McClenathan two months after vaccination, she reported right shoulder pain within 48 hours of the flu vaccination on December 18, 2017, with significant soreness at the vaccination site. Ex. 2 at 115. When she presented for an MRI two days later, she again reported shoulder pain beginning two days after vaccination. *Id*. at 112. At her PT evaluation the following month, 95 days after vaccination, she reported pain that began "~90 days ago," and "immediately 2-24 hours" after her flu shot. *Id*. at 108. The same day, she told her orthopedist that her pain began "two-three days" after her flu vaccination. *Id*. at 103.

While Petitioner's reports about when her shoulder pain began are not identical to one another, these differences do not cast sufficient doubt to rule against her on this point. Rather, Petitioner's descriptions of her pain while seeking diagnosis and treatment are consistent in placing onset very close in time to vaccination – predominantly within 48 hours of vaccination. These medical records are further bolstered by Petitioner's affidavit testimony, where she states that her pain, swelling, and stiffness began within 48 hours of vaccination. Ex. 17 at ¶ 4. She provided a plausible explanation for not complaining about her right shoulder pain at her appointment four days after vaccination – that she thought the soreness she was experiencing was normal, temporary soreness that would go away on its own. *Id*.

I give somewhat less weight to the January 22, 2018 record than the remaining medical records due to the alterations. It is not clear when the alterations were made, but seems likely they were made around the time of the May 2019 letter from Dr. Dalvi – which would be approximately 16 months after the appointment, making the changes not contemporaneous. While the initial typed record appears to have been made contemporaneously, the fact that Dr. Dalvi later determined that the record required editing casts doubt on the accuracy of the information in the initial record. As such, it merits less weight.

But even disregarding this record entirely does not prevent a finding that preponderant evidence supports the alleged onset, given both the overall timeframe of complaints of shoulder pain less than two months after vaccination and the consistency of later records as to onset.

### 2. Other SIRVA QAI Criteria

Respondent does not contest the remaining SIRVA QAI criteria, and I find that the record contains preponderant evidence that they are satisfied. Petitioner did not have a

history of right arm pain or injury prior to vaccination that would explain her symptoms after vaccination. *See* Exs. 7; 12. Her pain and reduced ROM were limited to her right. shoulder, where the flu vaccine was administered, and no other condition or abnormality has been identified that would explain her post-vaccination symptoms. *See* Exs. 2, 4, 7; 12.

### E.  Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 2 at 13. She experienced the residual effects of her condition for more than six months. Ex. 2 at 28-31, 58-73, 92-93. She averred that neither she, nor any other party, has ever filed an action, or received compensation in the form of an award or settlement, for her vaccine-related injury. Ex. 6 at ¶¶ 5-6.

## III.  Request for Anticipated Loss of Earnings

Whether Petitioner is entitled to anticipated loss of earnings based on an allegedly reduced annuity resulting from an early retirement is a damages issue, and thus I do not decide it here. However, because the parties have addressed it in their briefing, I will provide my preliminary views.

While Petitioner asserts that her vaccine-related injury "necessitated" her early retirement (Pet. at 14-17), this does not appear to be supported by the record. Petitioner retired on May 31, 2019. Four months before, her orthopedist noted that she had improved "fairly significantly," but continued to have pain in her shoulder with motion. Ex. 2 at 235. Her orthopedist thought it was likely she would continue to improve and ordered more PT. *Id.*

Petitioner's PT records from the months before her retirement suggest that she remained symptomatic, but only mildly so. At a PT evaluation on February 7, 2019, three and a half months before her retirement, she had signs and symptoms consistent with a frozen shoulder diagnosis, and reported that she continued to have pain with certain movements – but, significantly, also reported that *her shoulder had not bothered her at work*. Ex. 4 at 2. Two weeks later, she reported that her shoulder was "pretty good," with no pain at rest. *Id.* at 11.

Over the next two months, she continued PT, reporting improvements but some remaining discomfort. Ex. 4 at 2-33. At several appointments, she reported no pain. *Id.* at

15

13, 25, 27. At other appointments, she reported some arm pain or discomfort. *Id.* at 2, 5, 19, 31, 33. At her last PT session before retiring, on April 8, 2019, she showed improved joint mobility and was able to perform exercises without an increase in pain. *Id.* at 33.

The records in the months leading up to Petitioner's retirement thus suggest mild and intermittent symptoms. *See generally* Exs. 2, 4. I acknowledge Petitioner's affidavit testimony about the impact her injury had on her work performance and quality of life. Ex. 17 at ¶ 20. I do not doubt that Petitioner experienced pain and discomfort from her injury during this time. However, the record does not appear to support a finding that her symptoms were significant enough to *require* her to retire early. *See, e.g.*, *Taylor v. Sec'y of Health & Human Servs.*, No. 18-100V, 2021 WL 1346059, at *6 (Fed. Cl. Spec. Mstr. Mar. 12, 2021) (denying request for lost wages based on alleged early retirement due to insufficient evidence, noting that medical records did not include evidence of significant ongoing symptoms). On the record as it stands, I would not likely be able to award Petitioner the requested damages on the basis that her injury required an early retirement (although the issue may be appropriately developed a bit more before any formal damages decision is made).

## Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration. I find that all other SIRVA Table requirements are met, as are other requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that she is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
